Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| R.R., and E.R.,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>BLUE SHIELD of CALIFORNIA,<br><br>　　　　Defendant. | COMPLAINT<br><br>Case No. 2:22-cv-00502 - JCB |

Plaintiffs R.R. and E.R., through their undersigned counsel, complain and allege against Defendant Blue Shield of California ("BSC") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. R.R. and E.R. are natural persons residing in Contra Costa County, California. R.R. is E.R.'s father.

2. BSC is an independent licensee of the nationwide Blue Shield network of providers and was the insurer and claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

1

3. The Plan is a fully-insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). R.R. was a participant in the Plan and E.R. was a beneficiary of the Plan at all relevant times. R.R. and E.R. continue to be participants and beneficiaries of the Plan.

4. E.R. received medical care and treatment at Innercept from February 13, 2020, to May 4, 2021. Innercept is a treatment facility located in Idaho, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. BSC denied claims for payment of E.R.'s medical expenses in connection with his treatment at Innercept.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions and because BSC does business in Utah through its network of affiliates.

8. In addition, R.R. has been informed and reasonably believes that litigating the case outside Utah will likely lead to substantially increased litigation costs for which he will be responsible to pay, which would not be incurred if venue of the case remains in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

9. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for

appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### E.R.'s Developmental History and Medical Background

10. E.R. was adopted from South Korea around the time that he was five months old. E.R.'s birth mother was only thirteen years old when she had him and R.R. was given no details about the birth father. Nevertheless, E.R. was healthy and adapted well to his new life in the United States.

11. As E.R. grew older he became increasingly defiant with caregivers and many of them refused to watch him due to his behavioral issues. E.R. underwent neuropsychological testing in the second grade and was diagnosed with ADHD. He began meeting with a psychiatrist and was given a 504 plan at school.

12. E.R. started to receive detentions and suspensions and got into fights at school. He threw repeated tantrums. E.R. attempted programs such as Cub Scouts but his behaviors were too disruptive and so he left the program.

13. E.R. started homeschooling, he also developed an unhealthy obsession with fire and would do things like burn ants by igniting the stream on a spray paint can. R.R. had to lock up any incendiary materials.

14. E.R. continued to act out, and on one occasion when he was being watched by his grandparents, he shoved his grandfather out of the way and ran out into the street, refusing to come back in until he talked to his parents.

15. E.R. rebelled against being homeschooled and wanted to go to a "regular school." He began attending a facility with one-on-one instruction but was manipulative and often refused to do his schoolwork.

16. At times E.R. became so aggressive that his mother would have to lock herself in her bedroom to stay safe. Once E.R. had calmed down, he would then act like nothing had happened.

17. E.R. would destroy property such as breaking holes in doors and walls or smashing things with a sledgehammer. He would throw things, set them on fire, and attempt to physically intimidate his mother and the dog. E.R. was also caught stealing a laptop from school.

18. During a ski-trip with his family, E.R. had a psychotic episode and became paranoid that intruders were out to get him and started fashioning weapons to keep the intruders away.

19. E.R. started seeing a new psychiatrist, but his behaviors continued to escalate. He was cruel to his friends, participated in Neo Nazi chat groups, and planned fights.

20. E.R. started experiencing visual hallucinations and seeing figures who were not actually there.

21. E.R. was homeschooled again but continued to destroy property and threaten his family whenever a boundary was set. E.R. would deliberately destroy items that were important to the family member he was trying to intimidate.

22. He again changed psychiatrists and was additionally diagnosed with anxiety and oppositional defiant disorder.

23. In January of 2018, E.R. was taken to the psychiatric ward after barricading himself in his room, self-harming with a piece of broken glass, and threatening to burn the house down.

24. A few months later in March of 2018, the SWAT team was called out after E.R. again barricaded himself in his room, this time with a block of kitchen knives.

25. E.R. received mental health hospitalization for five days, after which he briefly began attending a partial hospitalization program but refused to participate after only a few days. E.R. then began receiving residential treatment care followed by intensive outpatient services. These interventions were not successful,

26. E.R. continued to be physically aggressive and continued to experience visual hallucinations. E.R. also began hearing auditory hallucinations directing him to harm others. E.R. was placed on Home and Hospital Care.

27. E.R. was additionally diagnosed with schizoaffective disorder: bipolar type. E.R. continued to threaten his family and was again hospitalized on January 10, 2020, after he threatened his therapist with physical violence.

### Innercept

28. E.R. was admitted to Innercept on February 13, 2020.

29. In a letter dated February 19, 2020, BSC denied payment for E.R.'s treatment. The letter gave the following justification for the denial:

    > Residential care was asked from February 13, 2020. You had hospital care before this. You showed better behavior. You're taking your medicine. You do not want to harm yourself or others. There are no medical issues. You do not need around-the-clock care. You do need to learn anger control. You need coping skills. You need therapy. It appears you can be treated in a program you can attend several days a week for several hours each day (such as a mental health partial hospitalization program or PHP) which is available.

30. On May 26, 2020, R.R. submitted an appeal of the denial of payment for E.R.'s treatment. R.R. reminded BSC that he was entitled under ERISA to certain protections during the review process, including a full, fair, and thorough review using appropriately

qualified reviewers which took into account all of the information he provided and gave him the specific reason(s) for the adverse determination, referenced the specific plan provision on which the denial was based, and which gave him the information necessary to perfect the claim.

31. R.R. argued that there were no other options apart from residential treatment to successfully treat E.R. He wrote that multiple levels of care had been attempted to treat E.R. but not a single one had been able to effect lasting change in E.R.'s mental health or his ability to manage his dysregulation.

32. He argued that E.R.'s behavioral health history clearly showed that he had severe and chronic health issues which could not adequately be managed at home, nor were E.R. or those around him safe in an outpatient environment. R.R. reminded BSC that shortly prior to his admission to Innercept, E.R. had threatened his therapist and been hospitalized.

33. R.R. stated that while it was true that E.R. had received hospital care, this did not mean that his longstanding conditions had suddenly resolved. He stated that BSC's denial made him concerned "that the reviewer did not bother to acquaint themselves with [E.R.]'s behavioral history."

34. R.R. stated that in many cases E.R. was only medication compliant when he stood in front of E.R. and watched him take his pills. This was a process that often took upwards of fifteen minutes. He wrote that E.R. often behaved aggressively at home and exhibited manic and paranoid behaviors which became increasingly common.

35. He wrote that residential treatment was the lowest level of care at which E.R. could be safely and effectively treated. R.R. included letters of medical necessity to support this contention.

36. In a letter dated March 30, 2020, J. Kirk Hartman M.D. wrote in part:

    I am a board-certified child, adolescent, and adult psychiatrist and was the treating outpatient psychiatrist for [E.R.] April 2017 through January 2020. [E.R.] was initially evaluated on April 17, 2017. The evaluation consisted of a psychiatric interview, which covered past medical, psychological, and family histories; review of questionnaires; presentation of the clinical impression; and discussion of treatment options and recommendations. [E.R.'s] symptoms are consistent with Bipolar Disorder, current episode manic with psychotic features, unspecified versus Schizoaffective Disorder. [E.R.] receives regular psychiatric treatment at my office as well as therapy with Dr. Barton Lynch. David Heckenlively, MS, MFT has consulted with [E.R.] and his family regarding options for appropriate treatment settings.

    I have worked collaboratively over the years with his therapist Barton Lynch and even referred him for a second opinion to Kiki Chang who is one of the top pediatric psychiatrists in the nation. [E.R.] has been on some of the most potent psychiatric medication combinations that modern medicine can offer, as well as engaged in quite literally every level of therapeutic setting: [sic] a previous partial hospitalization program (PHP) (2018), previous residential treatment program (2018), and multiple psychiatric hospitalizations (2018 & 2020). Despite these intensive interventions, [E.R.] continued to struggle with agitated, aggressive, and impulsive behavior that is often threatening toward his family. Therefore, I strongly recommend [E.R.] enter residential care. It has been the consensus of his entire treatment team that [E.R.] required longer term, residential treatment.

37. David Heckenlively, MS, MFT, wrote in a letter dated April 3, 2020:

    I discovered in consultation with [E.R.]'s clinical professionals, Dr. Barton Lynch, psychologist, and Dr. J. Kirk Hartman, psychiatrist, the concerns they both have for [E.R.]. They both highlighted [E.R.]'s high impulsivity, failure in school, and how a variety of heavy medications barely slowed down his racing and, at times, psychotic thoughts. Dr. Hartman mentioned that [E.R.] would experience his different personas, or voices, louder when he was emotional making his illness mood contingent. Dr. Lynch had to initiate two hospitalizations for acute psychiatric care.

    After consulting with the professionals and making my own assessment, I recommended [E.R.]'s parent consider a residential treatment center that specializes in treating and educating students similar to [E.R.]. I have assessed for

treatment over 1000 teens over my career and strongly believe [E.R.] needed a change in setting and a skilled, professional immersive program to change his unstable and worsening trajectory. When I see this is the case for a teenager, my job is to recommend and help line up the student, such as [E.R.], and his whole family with the most appropriate and effective options based on my vast experience.

My professional recommendation was for [E.R.]'s parents to send him to an intensive longer-term residential treatment center called Innercept, based in Idaho for assessment and treatment. Innercept specializes in students who are highly intelligent and behaviorally compromised by learning, emotional, psychiatric, and family challenges. Innercept also specialized with mood and thought disorders, one of the few in the country that is longer-term for teenagers. The combination of a sophisticated therapeutic model, medication management, a highly trained, licensed clinical staff, and a highly structured and warm setting enable students at Innercept, like [E.R.] to make significant progress in learning, mental health, self-care and awareness, and family relationships. [E.R.]'s parents enrolled him in Innercept in early mid-February 2020.

38. Kiki Chang MD, wrote in a letter dated April 4, 2020:

> I first met with [E.R.] and his parents on May 16, 2019 for an initial evaluation. I also spoke with Dr. Hartman and [E.R.]'s outpatient therapist, Dr. Barton Lynch, and used genetic testing to better understand how [E.R.] metabolizes medication. I diagnosed [E.R.] with Schizoaffective Disorder, Bipolar Type (F25.0). In consultation with Dr. Hartman, [E.R.]'s medications were changed including the addition of a newly developed antipsychotic, Vraylar.
>
> I met with the [R.] family 3 additional times to monitor [E.R.]'s progress. While the new antipsychotic had some positive effect on [E.R.]'s ongoing hallucinations, [E.R.] was still experiencing significant mood dysregulation and paranoid thinking. It became clear [E.R.] would need more intensive psychological and behavioral interventions which could not be effectively implemented in an outpatient, home setting. A residential level of care was clearly necessary to achieve significant and lasting improvement of [E.R.]'s condition. I considered this to be a medically necessary treatment course and I recommended such to his parents.

39. Barton Lynch Psy.D., wrote in a letter dated April 5, 2020:

> Dr. Kirk Hartman M.D. Psychiatrist and the writer continued to provide outpatient support to care for [E.R.]. The writer worked with [E.R.] 4 days per week, reestablishing a home behavior and safety plan. During this time, [E.R.] began to disclose a history of experiencing both auditory and visual hallucinations. [E.R.]'s diagnosis was Bipolar I with psychotic features. During this time, [E.R.] expressed intense fear resulting from chronic psychotic symptoms. Unfortunately,

> medication strategies although helpful, served mildly during manic episodes resulting in aggressive behaviors and property destruction.
>
> [E.R.]'s psychotic symptoms continued to wax and wain [sic] with presentations of disorganization, paranoia, and agitation. Two months prior to [E.R.]'s last hospitalization, there was a significant increase in his aggressive behaviors that could not be managed safely outpatient any further. [E.R.] began to aggressively and physically posture to his parents with threats. Unfortunately, due to his psychotic symptoms, he lacked insight regarding the danger of these behaviors. It was determined that appropriate residential care was needed. David Heckinlively MFT, was the placement consultant. On 1/10/2020 this writer had the police come to the office to 5150 [E.R.] for threatening to kill his therapist and becoming verbally aggressive and physically posturing in the office. Additional threats of harm were made to his mother as well.
>
> [E.R.] is and will continue to need a higher level of care as the one he currently attends. [E.R.] has limited time until emancipation, and there are still significant diagnostic concerns. There is a necessity for a rich treatment environment with all disciplines and social facilitation under "one roof" to better help this young man.

40. R.R. stated that it was the opinion of all of E.R.'s treating professionals that he required the level of care he was receiving at Innercept. He asked BSC to clarify on what basis it disagreed with the opinions of the medical professionals who had treated E.R. on a firsthand basis and actively witnessed the deterioration of his condition.

41. R.R. asked that the reviewer be trained in MHPAEA and alleged that the denial of payment for E.R.'s treatment violated the statute. He reminded BSC that MHPAEA compelled insurers to offer coverage for mental health services "at parity" with comparable medical or surgical services.

42. He identified intermediate level medical services such as skilled nursing facilities as the appropriate analogues to the treatment E.R. received. R.R. expressed concern that while BSC had utilized proprietary criteria to deny E.R.'s residential treatment it did not appear to have any such criteria for skilled nursing facilities. He wrote that if this were indeed the case it would be evidence of a direct parity violation.

43. He additionally alleged that BSC's use of acute level criteria to evaluate the non-acute residential treatment R.R. received was a parity violation as it did not use acute level criteria to evaluate non-acute medical or surgical care.

44. He asked that in the event the Plan was compliant with MHPAEA that BSC explain to him in detail why he was mistaken and that it provide him with examples of its MHPAEA compliance using specific evidence.

45. R.R. contended that BSC's denial violated generally accepted standards of medical practice and asked that the reviewer utilize the Plan's definition of medical necessity rather than proprietary criteria.

46. He wrote that residential treatment was the lowest level of care at which E.R. could be safely and effectively treated. He also contended that it was inconsistent with generally accepted standards of medical practice to make E.R.'s treatment contingent on the presence of a risk to himself and others.

47. He stated that it was apparent from the reviewer's notes that the reviewer failed to take into account critical information during the review process but had instead cherry-picked data points. He noted that the reviewer did not mention the failure of other levels of care.

48. R.R. accused BSC of intentionally restricting the availability of care in order to safeguard its financial bottom line. He also alleged that E.R.'s symptoms were sufficiently severe that they met the criteria for "Serious Emotional Disturbances of a Child," and additionally should have been covered under California law.

49. He argued that E.R. clearly could not be treated at home given the intensity of his condition, his hostile behaviors, and the fact that he was at times unable to distinguish between fiction and reality and whether the voices he was hearing were real.

50. In the event the denial was upheld, R.R. asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines used in the determination as well as their medical or surgical equivalents, regardless of whether these were used to evaluate E.R.'s treatment, along with any reports or opinions from any physician or other professional who evaluated the claim along with their names, qualifications, and denial rates (collectively the "Plan Documents").

51. He asked that in the event BSC did not possess these materials or was not acting on behalf of the Plan Administrator in this regard that it forward his request to the appropriate entity.

52. In a letter dated August 14, 2020, BSC upheld the denial of payment for E.R.'s treatment. The letter gave the following justification for the denial:

> Your request for coverage at Innercept, where you get treatment both days and nights (residential treatment program, RTC), from February 13, 2020, through May 7, 2020, with discharge on May 8, 2020, for mental illness cannot be approved for payment. The main reason is that it was not medically necessary for you to have treatment during the night. A review of your medical records submitted to Blue Shield shows that the treatment you received from February 13, 2020, through May 7, 2020, with discharge on May 8, 2020, could have been safely given where you do not spend nights at the program. You did not require being watched 24 hours per day. You were not a danger to yourself or others. You did not have troubles taking care of yourself. You were cooperative in your treatment and participating in your therapy sessions. There were no active medical issues complicating your treatment. It did not appear that treatment at a less monitored level of care would make you worse (relapsing) without RTC, and you could have been safely been [sic] treated at a lower level of care. As per your health plan, if there are two or more medically necessary services that may be provided for an illness, injury or medical condition, Blue Shield will provide benefits based on the most cost-effective service. Since a lower level of care is more cost effective than RTC, and you could have safely been treated at a lower level of care; coverage of RTC was not medically necessary from February 13, 2020, through May 7, 2020, with discharge on May 8, 2020. This decision is

> based on the 2019 – 2020 Magellan Care Guidelines as adopted by Blue Shield's Mental Health Service Administrator (MHSA) – Residential Behavioral Health Level of Care, Child or Adolescent, You can contact the Blue Shield's MHSA at 1-877-263-9952 to see which in-network programs are available in your geographic area.
>
> In addition, your appeal was reviewed by an independent mental health doctor (psychiatrist, Child and Adolescent) who agrees that RTC is not medically necessary from February 13, 2020, through May 7, 2020, with discharge on May 8, 2020. Her comments were:
>
> The clinical information provided does not indicate that the service requested was medically necessary or was likely to be successful in treating the patient's symptoms. The clinical information reviewed indicates that the patient had no significant ongoing symptoms that required residential treatment level of at [sic] the time of his admission on February 13, 2020. The patient was not reported to have any suicidal or homicidal ideations or deemed to be at persistent high risk of harm to self or others. He was noted to have intermittent episodes of paranoia or delusional thoughts which appeared to be chronic and his baseline. There was no indication of the patient had [sic] any symptoms suggestive of command hallucinations, persecutory delusions, or severe paranoia. He was not noted to have any significant ongoing symptoms suggestive of mania or hypomania. He was noted to have intermittent episodes of agitation, irritability and mood dysphoria. However, he was not reported to have exhibited any significant and persistent agitation or aggressive behaviors that represented a change from his baseline. The patient was not reported to have any significant adverse effects from his medications. He was not reported to have any significant ongoing medical conditions that required frequent interventions or monitoring. The patient was not reported to have any significant functional impairments including activities of daily living or self-care that represented a change from baseline. The clinical information reviewed indicates that the patient may have been treated safely in a less restrictive setting and lower level of care such as a partial hospitalization program. Interventions including individual, group and family therapy in addition to medication management proposed for this patient during residential treatment may have been provided safely and effectively in a day treatment setting.

53. The letter also included a more detailed report from the external reviewer which offered a similar justification for the denial.

54. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

55. The denial of benefits for E.R.'s treatment was a breach of contract and caused R.R. to incur medical expenses that should have been paid by the Plan in an amount totaling over $225,000.

56. BSC failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities in spite of R.R.'s request.

### FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

57. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as BSC, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

58. BSC and the Plan failed to provide coverage for E.R.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

59. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

60. The denial letters produced by BSC do little to provide confidence that BSC conducted a meaningful analysis of the Plaintiffs' appeals or that it carried out a "full and fair review" to which the Plaintiffs are entitled. BSC failed to substantively respond to the issues presented in R.R.'s appeals, ignored undisputed facts in the medical records that directly

related to the medical necessity criteria BSC purported to apply and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

61. BSC and the agents of the Plan breached their fiduciary duties to E.R. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in E.R.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of E.R.'s claims.

62. The actions of BSC and the Plan in failing to provide coverage for E.R.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

**SECOND CAUSE OF ACTION**

**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

63. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of BSC's fiduciary duties.

64. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

65. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

66. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

67. The medical necessity criteria used by BSC for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

68. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for E.R.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

69. For none of these types of treatment does BSC exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

70. When BSC and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

71. BSC and the Plan evaluated E.R.'s mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

72. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, BSC's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that E.R. received.

73. BSC's improper use of acute inpatient medical necessity criteria is revealed in the statements in BSC's denial letters such as "The patient was not reported to have any suicidal or homicidal ideations or deemed to be at persistent high risk of harm to self or others."

74. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that E.R. received. The Plan does not require individuals receiving treatment at sub-acute inpatient facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

75. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

76. The Defendant cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally

accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

77. In addition, the level of care applied by BSC failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

78. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

79. R.R. noted that BSC restricted the availability of E.R.'s treatment by forcing it to comply with requirements contained only within proprietary criteria. R.R. argued that not only did BSC exempt comparable medical or surgical services from these requirements, but it did not appear to have proprietary medical or surgical criteria for analogous medical/surgical care at all. R.R. requested to be provided with these criteria if they existed, but BSC ignored this request.

80. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and BSC, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

81. BSC and the Plan did not produce the documents the Plaintiffs requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive

capacity the Plaintiffs' allegations that BSC and the Plan were not in compliance with MHPAEA.

82. The violations of MHPAEA by BSC and the Plan are breaches of fiduciary duty and also give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

   (a) A declaration that the actions of the Defendant violate MHPAEA;

   (b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

   (c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

   (d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

   (e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

   (f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiffs as make-whole relief for their loss;

   (g) An order equitably estopping the Defendant from denying the Plaintiffs' claims in violation of MHPAEA; and

   (h) An order providing restitution from the Defendant to the Plaintiffs for their loss arising out of the Defendant's violation of MHPAEA.

83. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1. Judgment in the total amount that is owed for E.R.'s medically necessary treatment at Innercept under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 5th day of August, 2022.

By     s/ Brian S. King
        Brian S. King
        Attorney for Plaintiffs

County of Plaintiffs' Residence:
Contra Costa County, California